UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TYLANN DURRETT,<br><br>    Plaintiff,<br><br>v.<br><br>CITY OF CHICAGO, et al.,<br><br>    Defendants. | No. 19 CV 312<br><br>Judge Manish S. Shah |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Tylann Durrett alleges that two Chicago Police Department officers pulled him over and arrested him because he was a black man driving an expensive car on the south side of Chicago. When he went to the police station to complain, a third officer told him that if he complained, she would comment on anything he submitted and say that the other two officers did nothing wrong. Durrett brings an action against the two arresting officers under 42 U.S.C. § 1983 for violations of the Fourth Amendment and the equal protection clause, against the third officer as a ratifying supervisor, and against the City of Chicago pursuant to *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). Defendants move to dismiss the equal protection and *Monell* claims.

**I.    Legal Standards**

A complaint must contain a short and plain statement that plausibly suggests a right to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009); Fed. R. Civ. P. 8(a)(2). In ruling on a motion to dismiss, although a court must accept all factual allegations

as true and draw all reasonable inferences in the plaintiff's favor, the court need not do the same for legal conclusions or "threadbare recitals" supported by only "conclusory statements." *Ashcroft*, 556 U.S. at 678, 80–82. The plaintiff must provide "more than labels" or "a formulaic recitation of a cause of action's elements," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), and the complaint must "contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Id.* at 562.

## II. Facts

Plaintiff Tylann Durrett, a black man, was driving an expensive car on the south side of Chicago. [1] ¶ 3, 8–9.[1] After performing a legal left-hand turn, Chicago Police Department officers (and defendants) Robert Pizzo and James Bansley pulled him over. *Id.* ¶ 11. They approached with their weapons drawn, ordered him out of the car, and handcuffed him. *Id.* ¶ 14. After running Durrett's car and name, they said the car "came back to a stolen Yamaha" and released him. *Id.* ¶¶ 15, 19. Durrett alleges that there was no legal basis for the stop, *id.* ¶ 10, that he was the properly registered owner of the car, *id.* ¶ 18, and that Pizzo and Bansley pulled him over "because he was a Black man on the Southside of Chicago driving an expensive car." *Id.* ¶ 9.

Durrett says this was the third time in as many months that he had been pulled over without lawful reason. [1] ¶ 16. He immediately went to the police station

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings. The facts are taken from the allegations in the complaint. [1].

to complain. [1] ¶ 20. There he met Chicago Police Department officer Migdalia Bulnes, who ran a search on Durrett's vehicle and reported that it did not "come up stolen." [1] ¶ 21. Durrett alleges that Bulnes knew there was no lawful basis for the stop and yet told Durrett that Pizzo and Bansley had acted correctly. [1] ¶ 23. Durrett also says that Bulnes told him that if he were to file a complaint, she would "put into the complaint that [Pizzo and Bansley] had done nothing wrong." [1] ¶ 23.

## III. Analysis

In order to state a claim under 42 U.S.C. § 1983, Durrett must allege "(1) an action taken under color of state law (2) which violates his federal constitutional rights." *Cunningham v. Southlake Ctr. For Mental Health, Inc.*, 924 F.2d 106, 107 (7th Cir. 1991). The equal protection clause of the Fourteenth Amendment is violated when the "defendants' actions had a discriminatory effect and were motivated by a discriminatory purpose." *Chavez v. Illinois State Police*, 251 F.3d 612, 635–36 (7th Cir. 2001).

Defendants say the complaint cannot be read to allege that Pizzo and Bansley treated all black people in a discriminatory manner. That may be true, but that is also not determinative; Pizzo and Bansley may still have violated Durrett's right to equal protection of the laws if they arrested him (and only him) because he is black. *See Brown v. Budz,* 398 F.3d 904, 916 n.1 (7th Cir. 2005) ("an allegation as simple as "'I was turned down a job because of my race" is all a complaint has to say' to plead sufficiently race discrimination in violation of the Equal Protection clause") (quoting *Bennett v. Schmidt*, 153 F.3d 516, 518 (7th Cir. 1998)).

Durrett's allegations that Pizzo and Bansley arrested him because he is black is in this context a factual allegation, not a legal conclusion. His claims against them in their individual capacities do not depend on an assumption that Pizzo and Bansley pulled him over in concert with other unnamed officers, *see* [17] at 4, because a reasonable inference is that Pizzo and Bansley violated Durrett's rights on their own. And the complaint does not allege a set of facts that is consistent with a lawful traffic stop; it alleges that Pizzo and Bansley had no lawful reason to arrest him. *See* [1] ¶¶ 8–10. The complaint provides Pizzo and Bansley with notice as to the claims against them, is not "so sketchy or implausible" that it fails to provide sufficient notice, and is not simply an "abstract recitation of the elements of a cause of action." *See Brooks*, 578 F.3d at 581.

In their reply, defendants argue that the complaint alleges a legitimate purpose for the stop: after "running [Durrett's] car" (presumably, through a police database), the officers came to believe the vehicle was stolen. [21] at 2. But one reasonable inference is that Pizzo and Bansley did not perform the database search until after Durrett had been pulled over, *see* [1] ¶ 15; *see also id.* ¶ 10 ("[t]here was not legal basis for the stop"), and Durrett has sufficiently alleged that the database search was a pretextual justification. *See* [1] ¶¶ 15–16. The complaint also alleges that when Bulnes ran a search, Durrett's car did not come up stolen. *Id.* ¶ 21. Another reasonable inference is that Pizzo and Bansley did not run the plate as they claimed when they spoke to Durrett; instead they intentionally discriminated against Durrett on the basis of his race. In any event, defendants waived the argument by waiting to

4

raise it in in their reply brief. *Commonwealth Edison Co. v. U.S. Nuclear Regulatory Comm'n*, 830 F.2d 610, 621 n.7 (7th Cir. 1987). Durrett's equal protection claim against officers Pizzo and Bansley in their individual capacities is not dismissed.

Municipalities are only liable under § 1983 when the injury in question is inflicted by the "execution of a government's policy or custom." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). There are three ways to demonstrate the existence of such a policy: "proof of an express policy causing the loss, a widespread practice constituting custom or usage that caused the loss, or causation of the loss by a person with final policymaking authority." *Kujawski v. Bd. of Comm'rs of Bartholomew Cty., Ind.*, 183 F.3d 734, 737 (7th Cir. 1999). A plaintiff may premise their § 1983 claim on a "ratification" theory so long as they "allege that a municipal official with final policymaking authority approved the subordinate's decision and the basis for it." *Baskin v. City of Des Plaines*, 138 F.3d 701, 705 (7th Cir. 1998).[2]

---

[2] Durrett's complaint says very little about "widespread practice[s] constituting custom or usage." *See Kujawski*, 183 F.3d at 737. At most, it alleges that Durrett was stopped on two other occasions without lawful basis (although it does not allege that the officers in the other two instances were motivated by racial discrimination, *see* [1] ¶ 16–17), and that Bulnes knew Pizzo and Bansley had a "practice of unconstitutional stops and racial profiling." [1] ¶ 41. It makes no other allegations regarding the existence of a widespread practice at the Chicago Police Department. This is not enough to "nudg[e]' his claim . . . 'across the line from conceivable to plausible.'" *McCauley v. City of Chicago*, 671 F.3d 611, 618 (7th Cir. 2011). But even if it were, Durrett forfeited the argument by failing to assert in his complaint (or his opposition brief) that he had a viable *Monell* claim based on a widespread custom or practice. *Pelfresne v. Vill. of Williams Bay,* 917 F.2d 1017, 1023 (7th Cir. 1990) ("[a] litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority, forfeits the point"). The same conclusion is required of Durrett's claim that there was a widespread practice of lieutenants like Bulnes ratifying racially discriminatory conduct; there are no facts in the

When determining whether an individual is a "final decisionmaker," it is "helpful" to inquire into "(1) whether the official is constrained by policies of other officials or legislative bodies; (2) whether the official's decision on the issue in question is subject to meaningful review; and (3) 'whether the policy decision purportedly made by the official is within the realm of the official's grant of authority.'" *Valentino v. Vill. of S. Chicago Heights*, 575 F.3d 664, 676 (7th Cir. 2009) (quoting *Randle v. City of Aurora*, 69 F.3d 441, 448 (10th Cir. 1995)). Policymakers must be the "apex of authority for the action in question," *Vodak v. City of Chicago*, 639 F.3d 738, 748 (7th Cir. 2011), and "a municipality is not liable merely because the official who inflicted the alleged constitutional injury had the discretion to act on its behalf." *Fiorenzo v. Nolan*, 965 F.2d 348, 351 (7th Cir. 1992).

Durrett's complaint includes few details about officer Bulnes's authority. At most, it alleges that she was waiting at the police station when he arrived to make his complaint, had access to a database that had information about Durrett's license plate, and insinuated that she could make additions to any complaint Durrett submitted. [1] ¶¶ 20–23. That is not enough to make it plausible that Bulnes had "policymaking authority for the Chicago Police Department." [1] ¶ 33. On this point, the complaint simply states a legal conclusion. *Ashcroft*, 556 U.S. at 678, 80–82. *See also McCauley*, 671 F.3d at 618.

---

complaint that support a reasonable inference that was true, and a fleeting parenthetical mention of another case where such a widespread practice was alleged is insufficient. *Id.*

Durrett's briefing asserts that there was no city-wide ordinance setting out a policy for use-of-force or traffic stops in general, that Bulnes (as a "district lieutenant") was constrained only by the Chicago Police Department's general orders, that her decisions were not subject to meaningful review, and that the decision in question was "within the realm of her grant of authority by nature of being a lieutenant." [19] at 4–5. The problem with Durrett's argument is that it is undermined by his own allegations; according to Durrett, Bulnes at most threatened to comment upon any complaint he filed. *See* [1] ¶ 22. He does not allege that she stopped him from filing a complaint or denied his complaint herself, nor does he allege that he filed a complaint at all. *See* [1]. Even if she had the authority in question, Durrett has not alleged that she exercised it. *See* [1] ¶ 22. The only reasonable inference is that someone else—Bulnes's superior, perhaps, or a team of other people tasked with reviewing official complaints—had the discretion to grant or deny any complaint Durrett might have filed.

To the degree he cites case law in support of those assertions, that case law is unhelpful. *McMillian v. Monroe County, Alabama* addressed actions taken by an Alabama county sheriff, not a lieutenant in the Chicago Police Department; it says nothing about officer Bulnes's authority over the official complaint that Durrett contemplated filing (but apparently never actually filed). 520 U.S. 781, 785 (1997). And while *McMillian* does say that the relevant policymaking authority is that which pertains to the "particular area" and the "particular issue" at hand, Durrett has not alleged that Bulnes had the authority to review any complaint he might have filed

7

against Pizzo and Bansley—just that Bulnes had the authority to comment on it. *Vodak v. City of Chicago* says that, in 2011, Chicago's police superintendent had the "sole responsibility to make policy regarding control of demonstrations," 639 F.3d 738, 748 (7th Cir. 2011), but Durrett has not plausibly alleged that Bulnes had "sole responsibility" for reviewing or approving any complaint he might have filed (and, apparently, never filed). *See* [1] ¶ 22. Lastly, Durrett cites *Auriemma v. Rice* for the proposition that "local law" guides the inquiry into Bulnes's authority. 957 F.2d 397, 399 (7th Cir. 1992). That may be the case, but Durrett has failed to plausibly allege that "local law" granted Bulnes final policymaking authority—and again, even if he had, his complaint does not allege that Bulnes took any action beyond informing Durrett that she would comment on any complaint he filed.

Durrett asserts that Bulnes was "tasked with reviewing and approving" Pizzo's and Bansley's reports, and was "responsible for monitoring and approving the decisions of her subordinates, specifically their decisions to conduct this traffic stop and their use of force." [19] at 5. These additional allegations cannot be considered because they do not appear in the complaint, *see Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984) ("the complaint may not be amended by the briefs in opposition to a motion to dismiss"), but even if they could be, Durrett's allegations would still fail because the complaint still does not allege that Pizzo or Bansley filed any report that Bulnes could have approved, *see* [1], nor does it allege that Bulnes in fact did approve any such report. Simply having the power to approve the reports would not establish a violation—Bulnes would have had to use that power in a

8

discriminatory way. Finally, the complaint does not allege that Bulnes's report-approval power was the cause of (or "moving force" behind) Pizzo and Bansley's traffic stop of Durrett—the constitutional injury alleged. *See Ruiz-Cortez v. City of Chicago*, 931 F.3d 592, 598 (7th Cir. 2019). Durrett's *Monell* claim against the City of Chicago is dismissed.

Durrett's official-capacity claim against Bulnes is "merely another form of claim against the government entity itself." *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 870 (7th Cir. 1983). Since Durrett can only sue the City of Chicago (a municipality) under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978), and since Durrett's *Monell* claim is dismissed for the reasons discussed above, Durrett's claims against Bulnes are also dismissed. *See* [1] ¶¶ 5, 34; *Wolf-Lillie*, 699 at 870.

The City of Chicago is retained as a defendant in the case in order to ensure that, if defendants Pizzo and Bansley are found liable in their individual capacities, they may seek indemnification. *See* 745 Ill. Comp. Stat. Ann. 10/9-102; [1] ¶¶ 44–46; *Cobige v. City of Chicago*, No. 06 C 3807, 2009 WL 2413798, at *1 (N.D. Ill. Aug. 6, 2009) ("[b]ecause the City of Chicago is a potential indemnitor of the remaining individual Defendants, the Court will not dismiss the City of Chicago as a Defendant to this lawsuit at this time").

## IV. Conclusion

The motion to dismiss, [17], is granted in part, denied in part. Durrett's *Monell* claim against the City of Chicago is dismissed, as is his claim against officer Bulnes in her official capacity. All dismissals are without prejudice. *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana,* 786 F.3d 510, 519 (7th Cir. 2015).

ENTER:

Manish S. Shah
United States District Judge

Date: August 27, 2019